## Case No. 15,758.

### UNITED STATES v. MERCER et al.

[Deady, 502.] [1]

District Court, D. Oregon. Dec. 19, 1868.

FORFEITED RECOGNIZANCE — REMISSION — WHEN GRANTED.

On an indictment for smuggling, the defendant's recognizance was forfeited for failure to appear for trial according to the condition thereof; afterwards the defendant appeared and submitted to a trial, but the jury being unable to agree, were discharged without giving a verdict: on an application by such defendant, under section 6 of the act of February 28. 1839 (5 Stat. 322). to the court, for the remission of such forfeiture: *Held*. that it appearing to the court that the defendant was guilty of the crime charged, and that the amount for-

---

[1] [Reprinted from 30 Leg. Int. 344, by permission.]

[1] [Reported by Hon. Matthew P. Deady, District Judge. and here reprinted by permission.]

feited was not commensurate with the punishment deserved, that public justice required the forfeiture to be enforced.

[This was an indictment against A. S. Mercer, S. B. Parrish, George A. Ladd, and H. W. Rappeleye upon the charge of smuggling.]

William Strong, for the application.

W. W. Page, contra.

DEADY, District Judge. This is an application by the defendant, Mercer, to the court, to remit the penalty of $3,000 incurred by his bail, Levi Anderson, W. H. Gray and Philip Johnson, on account of Mercer's failure to appear for trial in May last according to their undertaking for him. The application is made under section 6 of the act of February 28, 1839 (5 Stat. 322), which reads as follows: "In all cases of recognizance in criminal cases taken for, or in, or returnable to, the courts of the United States, which shall be forfeited by a breach of the condition thereof, the said court for or in which the same shall be so taken, or to which the same shall be returnable, shall have authority in their discretion to remit the whole or a part of the penalty, whenever it shall appear to the court that there has been no willful default of the parties, and that a trial can notwithstanding be had in the cause, and that public justice does not otherwise require the same penalty to be executed or enforced."

The circumstances out of which the forfeiture arose and attendant upon it are as follows: In May, 1867, the defendant, Mercer, having been committed by Commissioner Wilcox upon a charge of smuggling, Messrs. Anderson, Gray and Robinson became bound as his bail in the sum of $3,000. On July 3, 1867, Mercer and four others were indicted by the grand jury of this district, for smuggling five one eighth casks of brandy and four barrels of wine and ten of whisky, into this district from the foreign port of Victoria; and that in November, 1867, Mercer and his co-defendants, except one, were arraigned and tried upon the charges in the indictment, and the jury, being unable to agree upon the guilt or innocence of the defendants, were discharged without giving a verdict. In May, 1868, the cause was again brought on for trial, when Mercer made default and did not appear according to the obligation of the undertaking of his bail; at the same time his three co-defendants were put on trial, and the jury being again unable to agree, as before, were discharged and a nolle prosequi entered as to such defendants. On May 15, and after the default of Mercer, the United States commenced an action against Mercer's bail to recover the penalty mentioned in their undertaking. In July following judgment was given for the plaintiffs in the action for want of answer for the sum of $3,000 and costs and expenses—but execution not to issue thereon except by leave of the court. This judgment was not entered until the November following. In July, 1868, Mercer appeared in court, and

upon the motion of the United States and the counsel of Mercer, the criminal action pending against him was continued until the November term. In December following Mercer appeared and submitted to trial on the charges in this indictment, and the jury being unable to agree as to his guilt or innocence, was discharged without giving a verdict; and thereupon a nolle prosequi was entered as to Mercer. On July 6, 1868, Mercer made application for the remission of the penalty incurred by his bail upon the grounds stated in his affidavit accompanying the application. The application was continued by the court to await the result of the criminal action. This latter having been disposed of, the application has been heard and submitted to the court for its action.

In his affidavit in support of his prayer for remission, Mercer states that it was his intention to have been present to answer to the indictment in May, 1868, when the second trial took place, and had made his preparations accordingly, but that he "was taken sick with the lung fever and rendered unable to undertake the journey from New York, where I had been on business to this place," (meaning Portland, I suppose); and that his absence as aforesaid was caused solely by his sickness and inability to attend as aforesaid. From this it appears that Mercer left Oregon and went to New York after his trial in November, 1867, well knowing that his bail had undertaken that he should be here in May following, when the action was set for retrial. To say the least of it, this conduct looks as if Mercer was willing to put his bail to great unnecessary risk, and that he regarded his obligation to be here, present in court in May, as a matter altogether secondary to such business or speculations as he might have or find in New York. In other words, if business permitted he would return and be present, if not, then he would not. No reason, urgent or otherwise, is shown for Mercer's going to New York instead of remaining here to await his trial. Absence under such circumstances, even where sickness is shown to be the proximate cause, borders closely upon willful default. But from the statement of "Robert H. Hannah, M.D." Mercer appears to have been taken sick about April 21. This was only twelve days before he was required to be present in this court. He could not have come here at that time in less than twenty days—certainly not in twelve. So it may be inferred that Mercer did not intend to be present, or he would have been far on the road hither, when it is said that he was taken sick in New York, and thereby detained there against his will and purpose. The appearance of the paper purporting to be signed by "Robert H. Hannah, M.D.," is calculated to excite suspicion as to its authenticity. It bears evident marks of having been changed from a simple certificate to an affidavit. The body of it is in the handwriting of the person purporting to be Dr. Hannah.

It commences, "New York, May 27, 1868. This may certify that I, Robert H. Hannah, a practicing physician in the city of New York, was called upon to visit A. S. Mercer, of Oregon," etc. Just below the signature a five cent stamp is placed and duly cancelled by Doctor Hannah, on May 27, 1868. After this was done, it appears that some one took the certificate in hand, to make an affidavit of it. For this purpose there was written at the top of the page, and in the left hand corner—"State of New York, City and County of New York." A line was then drawn through the words "This may certify that." A little further on and between the words "New York" and "was called" a carat (Δ) was placed, and the words, "being duly sworn say that I." interlined over it. On the margin opposite this interlineation are the capital letters, "E. L. O., N. P.," apparently intended as the initials of "Edward L. Owen, Notary Public," whose official seal and signature appears below the writing, affixed to the following jurat—"Sworn to before me this third day of May, 1868." All these interlineations and additions to the original certificate, are in one handwriting. The signature of the notary is probably in the same hand, but written with a different pen and ink. The supposed notary is made to certify that he swore Robert H. Hannah to this writing on May third, while in the same writing Hannah states that he had visited Mercer as late as May 23d. Hannah's signature appears from the date of the cancellation of the stamp and the one written at the head of the paper, to have been made on May 27, while according to the jurat of this supposed notary it was sworn to before him on the third day of the same month—just twenty-four days before. The writing is made upon a sheet of letter paper, and it is not likely that it was prepared by a notary, who would have used legal cap. It may be said·that Hannah may have first prepared it as his certificate, and that afterwards he went before the notary to swear to it. This is possible, but it is quite probable that upon such application the notary would have rewritten the matter, rather ·than to have blotted and interlined this one, in the manner that it is. It does not contain over 100 words and the labor of rewriting it, even if more than that of blotting and interlining it, would have been but a trifle. It is not business-like or professional for a notary to put his official seal and signature to an instrument, having the suspicious appearance that this has, to be used as evidence, particularly at a great distance from where he resides. Again the jurat does not state that the writing was subscribed before the notary, but only that it was sworn to before him. . Any fellow might have been picked up in the streets of New York and taken before the notary and sworn to the writing. It ought to appear from the jurat that Robert H. Hannah swore to it. These suspicious circumstances could not have escaped the notice

of counsel who ,presented this application. Notwithstanding this, the paper has been submitted in support of the application, without a word of explanation, from which I infer that no explanation favorable to the authenticity or character of the writing could be made. The certificate of a physician is not evidence. It is merely hearsay. A physician must give his testimony under the sanction of an oath, as in the case of men in general. This writing then, even if admitted to be the genuine certificate of "Robert H. Hannah, M.D.," is not legal evidence of the facts stated in it. As to its being his affidavit, I have very serious doubts.

But waiving these questions and even admitting for the moment that Mercer's default was not willful, did it prejudice the United States in the trial of the cause? I am inclined to think that this question ought to be answered in the affirmative, but of this I would not be positive. No testimony was lost between the trials in May and December, that I am aware of. But the defendants being separated in their trials by the absence of Mercer in May, the force of the case for the prosecution was weakened thereby. Upon such trial the party or parties not on trial were pointed out to the jury by the defence as a scape-goat upon which they might safely lay the whole guilt of the transaction which was the subject of the indictment. Delay is the usual defence of the guilty. If nothing else happens by the lapse of time, at least the accusation becomes stale, and of less and less public concern. Juries are not so readily or deeply affected by the moral turpitude of the transaction complained of, and are more reluctant to convict, even when the law and evidence require that they should. Honest witnesses forget many of the striking incidents and details of their story, so that their evidence loses much of its original force and effect, while dishonest and interested ones have the temptation and opportunity to exaggerate or invent circumstances to secure the acquittal of the accused. That causes like these have worked together to prevent Mercer from being found guilty at the last trial upon some of the counts in the indictment. there is much reason to believe.

But the important question in this application arises under the words of the statute, which in effect provides, that although the default was not willful, and the United States was not prejudiced in the trial of the cause, still. if the ends of public justice otherwise require that the penalty should be exacted or enforced, the court must not remit it.

It appears to me, from the evidence produced on the trial of this cause before the jury, that the ends of public justice do require that the penalty should not be remitted. The end and object of public justice is to convict and punish the guilty. There can be no doubt that Mercer, while acting as deputy-collector of customs for this district, assisted some or all of the other defendants to smuggle the four

barrels of wine and two of whisky into this district, as charged in the indictment. On January 25, 1867, the steamer Fideliter entered at Astoria from Victoria. On her manifest there were eleven barrels of dog-fish oil, shipped at Victoria, V. I., by S. Sargent to S. Sargent, at Portland, Oregon. The manifest of cargo contained no mention of any liquors, or of any other barrels, except some barrels of salmon. Mercer, with two inspectors, came up on the Fideliter to Portland. While here, he professes to have received the entry for consumption of those eleven barrels of oil by H. L. Gowan, and he certifies on such entry that H. L. Gowan came before him and subscribed and swore to the affidavit in the entry. H. L. Gowan had not power or authority to make this entry. He was not shown to have been the agent of the owner and consignee Sargent, and therefore Mercer, is shown to have violated the law and instructions in receiving the entry or allowing Gowan to make it even if it was genuine. This is a suspicious circumstance. But I cannot go over the testimony in detail. In my judgment, "H. L. Gowan" is a fiction, and no such person ever appeared before Mercer and made this entry or oath. His certificate to that effect is willfully and corruptly false. The entry is false and was probably made by one of the defendants, who filled up the printed form of entry, and signed it with the fictitious name of H. L. Gowan. Diligent inquiry has been made in this and surrounding counties for the past eighteen months for such a man as H. L. Gowan, but he has never been heard of, or shown to have ever existed. Of these eleven barrels, imported by the assistance of Mercer as dog-fish oil, four contained wine and two whisky. They were afterwards seized, condemned and sold by the government. These eleven barrels were inspected on the wharf under the immediate supervision and with the assistance of Mercer. Two barrels, which actually contained oil, were selected for inspection, one by the inspector, with Mercer's consent, and the other by himself. The barrels when rolled on the wharf were placed on one side, and the inspection of them was delayed until Mercer directed it to be done and took part in it. Mercer had authority to inspect these barrels, but it was not his duty while the two inspectors were present. He is not shown to have inspected or participated in the inspection of any other portion of the cargo. His business was to receive the entries and collect the duties. These barrels were hauled off the wharf soon after they were inspected under the direction of one of the defendants, without any permit, written or verbal, from the deputy being exhibited or communicated to the inspectors. The fact that four barrels of wine and two of whisky were smuggled into the district in January, 1867, is established beyond controversy by the decree condemning them as forfeited to the government for that cause. The evidence shows that six barrels seized and condemned were a part of the eleven described in the entry purporting to have been made before Mercer by H. L. Gowan, on January 28, 1867. This alone proves the entry to have been untrue—that the barrels did not all contain oil. But when we consider that the entry is in the handwriting of one of the defendants, and that no such person as H. L. Gowan exists or made such entry, the conclusion is irresistible that Mercer willfully and corruptly assisted to smuggle these foreign liquors into the district. The statute defining this crime—Act July 18, 1866, § 4 (14 Stat. 179)—prescribes the maximum punishment at a fine of $5,000 and ten years of imprisonment. This penalty sought to be remitted is far below the medium punishment. The crime committed by Mercer is an aggravated one, because at the time, he was in the pay and trust of the government as an officer of the customs, for the purpose of preventing just such frauds upon the government.

The application for the remission is denied.